CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

September 30, 2024
LAURA A. AUSTIN, CLERK
BY:
       /s/T. Taylor
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

|  |  |  |
|---|---|---|
| **TYRONE SHELTON,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:20cv00704 |
| | ) | |
| v. | ) | |
| | ) | |
| **B. L. KANODE, et al.,** | ) | **MEMORANDUM OPINION** |
| Defendants | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |
| | ) | |

This case is before the court on the defendants' motion for summary judgment, (Docket Item No. 143) ("Motion"). Based on my review of the evidence provided and the arguments and representations of the parties, and for the reasons set forth below, I will grant the Motion.

## *I. Facts*

The plaintiff, Tyrone Shelton, ("Shelton"), a Virginia Department of Corrections, ("VDOC"), prisoner who previously was incarcerated at Green Rock Correctional Center, ("Green Rock"), and River North Correctional Center, ("River North"), brings this action against the defendants, B. L. Kanode, David Anderson, J. Coleman, Major R. Northrup, Major H. Sharpe, B. Morton, B. Hall, M. McBride, S. Richardson, P. Ridge, R. Crosby, D. Joyce, D. Felts and S. Snow.[1] In his amended complaint, (Docket Item No. 51) ("Complaint"), Shelton seeks damages under 42 U.S.C. § 1983, alleging that the defendants were deliberately

---

[1]Claims against other defendants previously were dismissed by the court.

indifferent to his serious medical needs and interfered with his efforts to exhaust his administrative remedies in violation of the First and Eighth Amendments to the United States Constitution.  (Complaint at 27-30.) He is suing the defendants in both their official and individual capacities.  (Complaint at 3.)

In his Complaint, which is made under penalty of perjury, Shelton states that he previously had undergone extensive foot surgeries for left bunions and hammertoes. (Complaint at 2, 5.) Shelton states that, during a prior VDOC incarceration from 1991-2011, while housed mainly at Augusta Correctional Center, former VDOC Health Services Director Fred Schilling had approved his wearing special boots with steel plates, as suggested by an orthopedic physician. (Complaint at 5.) After re-entering VDOC custody in 2018, Shelton states an additional surgery was performed on his right foot, and, afterward, his physicians recommended he, again, be fitted for special boots. (Complaint at 6-8.)

Before Shelton was fitted for these boots, he was transferred to Green Rock, where, Shelton states that on November 7, 2019, Dr. Wang did not approve his need for the special boots, and, instead released him to general population still on crutches with nothing on his feet except socks. (Complaint at 10.) The next day, November 8, 2019, Shelton claims he hurt his left ankle while traveling to the dining hall on crutches. (Complaint at 11.) Shelton states that he was placed in a medical center observation cell until he was seen by Dr. Wang on November 11, 2019, and released back into general population. (Complaint at 11.) Shelton claims that he went on a hunger strike from November 11 to 16, to draw attention to the fact that he could not walk due to his injured left ankle and his inability to put pressure on his right foot due to the recent surgery and his need for specialized

–2–

boots, and, as a result was placed in administrative segregation. (Complaint at 11-12.)

Shelton states that he was released back to general population on November 19, 2019, "per directives" from Dr. Wang, and he was given a wheelchair and a pair of orange shower shoes "as prescribed" by Dr. Wang. (Complaint at 12.) Shelton alleges that he remained in the wheelchair until the third week of April 2020, when Dr. Wang had security staff confiscate the wheelchair. (Complaint at 14.) Shelton alleges that he had only the shower shoes to wear on his feet from November 2019 to August 2021, causing his feet to be cold and numb and him to suffer chronic pain and twist his right ankle on multiple occasions. (Complaint at 14-15.)

In December 2019, Shelton alleges, he filed a Regular Grievance regarding Dr. Wang denying him special boots. (Complaint at 12.) According to Shelton, Warden Melvin Davis, ("Davis"), found the Grievance unfounded because he had no order in his medical records for special boots. (Complaint at 12-13.) Shelton states that, in January 2020, he sent Davis a copy of his medical records showing that Scott J. Campbell with Powell Orthotics & Prosthetics, ("Powell"), had recommended special boots and that they had been paid for before Shelton was transferred to Green Rock. (Complaint at 13.) Shelton states that he appealed Davis's decision to VDOC Health Services Director Jeffrey N. Dillman, and "nothing was done." (Complaint at 13.)

Shelton states that, from November 19, 2019, to May 13, 2021, Green Rock Major R. Northrup, ("Northrup"), gave his security staff directives to allow

Shelton to have access to the prison dining hall and all other nonrestricted buildings while wearing the shower shoes. (Complaint at 15.) On May 13, 2021, Shelton alleges, he was escorted by security personnel from the prison yard to the Restrictive Housing Unit, ("RHU"), on the orders of J. Coleman, ("Coleman"). (Complaint at 15.) On May 14, 2021, Shelton alleges, security personnel, on orders of Coleman and Northrup, told him that he would not be released from the RHU until he gave up his shower shoes, and he was issued a pair of Reebok sandals/shower shoes to wear. (Complaint at 16.) Shelton alleges that he was allowed to freely walk around the prison, including traveling to the dining hall, in these Reebok shoes until June 22, 2021. (Complaint at 16.)

On June 22, 2021, Shelton states, D. Joyce, ("Joyce"), denied him entry into the prison dining hall. (Complaint at 16.) When he returned to his housing unit, B. Morton, ("Morton"), and R. Crosby, ("Crosby"), told him that he would not be allowed to travel to the dining hall to receive his meals unless he wore the state-issued boots on his feet. (Complaint at 16-17.) On June 29, 2021, Shelton states, Northrup also told him he would not be allowed to enter the prison dining hall unless he wore the state-issued boots. (Complaint at 17-18.) On July 7, 2021, P. Ridge, ("Ridge"), also approved of Joyce's decision to deny Shelton entry to the prison dining hall if he was not wearing the state-issued boots. (Complaint at 18.) On July 11, 2021, Shelton states, Ridge instructed Joyce to deny plaintiff access to the prison boulevard unless he was wearing state-issued boots. (Complaint at 18.)

On July 22, 2021, Shelton states, Coleman told him that Coleman had given directives to security personnel to deny Shelton access to the dining hall and boulevard unless he was wearing state-issued boots. (Complaint at 18.)

–4–

Nevertheless, Coleman said that, since Shelton had missed 62 meals in the previous month, some type of agreement had to be reached. (Complaint at 18-19.) Coleman agreed to allow Shelton to order two pairs of sneakers from an outside vendor, shoes which Shelton could wear to access the prison boulevard and the dining hall. (Complaint at 19.) Coleman directed that Shelton's meals be brought to his assigned building until these shoes arrived. (Complaint at 19.)

On July 29, 2021, Shelton states, Warden B. L. Kanode, ("Kanode"), found Shelton's Grievance regarding missing 62 meals unfounded, but he affirmed the agreement made between Coleman and Shelton regarding ordering sneakers for Shelton. (Complaint at 19-20.) Shelton states that he received the sneakers on August 5, 2021. (Complaint at 20.) As a result of wearing the sneakers, Shelton states, the pain, numbness and tingling he had experienced subsided, and he was allowed to enter the dining hall and have access to the prison boulevard. (Complaint at 20.)

During the period of time that he was not allowed access to the dining hall, Shelton states, the low amount of calories he was consuming resulted in dizziness, stomach cramps and weight loss. (Complaint at 20.)

Shelton states that he was transferred from Green Rock to River North on October 8, 2021, and both pairs of his sneakers were confiscated. (Complaint at 21.) Shelton states one pair was removed from his feet by defendant Correctional Officer D. Felts, ("Felts"), even though he told Felts that he needed the sneakers as support due to his serious orthopedic condition. (Complaint at 21.) Shelton states that he submitted an Informal Complaint on October 12, 2021, addressed to

defendant Major H. Sharpe, ("Sharpe"), Felts's supervisor, explaining that he had nothing to wear on his feet for support.  (Complaint at 21.) Shelton states that temporary Grievance Coordinator S. Snow, ("Snow"), "intentionally and in violation of departmental procedures" forwarded this Informal Complaint to the attention of Felts for a response, knowing that Felts was the subject of the Informal Complaint. (Complaint at 21.)

Shelton states that, on October 13, 2021, he was housed in the D Building under the supervision of defendant Unit Manager B. Hall, ("Hall"). (Complaint at 22.) Shelton states that he filed several Emergency Grievances with Hall, complaining that he was forced to walk around with only socks on his feet, subjecting him to possible irreparable damages and personal injury. (Complaint at 22.) Nonetheless, Shelton states, Hall took no action. (Complaint at 22.) Shelton states that he submitted Regular Grievances on October 26 and November 3, 2021, to the attention of Warden David Anderson, ("Anderson"), trying to retrieve his sneakers. (Complaint at 22.) Shelton states that Snow refused to process these Grievances "under false pretenses to protect Anderson and Felts from liabilities." (Complaint at 22.)

Shelton states that an interoffice email was sent out from medical personnel on October 14, 2021, requesting that Felts or Anderson take the initiative to return the sneakers to Shelton until he could be seen by orthotics. (Complaint at 22.) Felts and Anderson refused to return the sneakers. (Complaint at 22.) As a result of walking around in only socks, Shelton states, he suffered inflammation, swelling and pain in his feet, for which he was prescribed ibuprofen 600 mg to take twice daily. (Complaint at 23.)

Shelton states that A Building Unit Managers M. McBride, ("McBride"), and S. Richardson, ("Richardson"), responded to his Emergency Grievances between December 7 and 12, 2021, and were aware that Shelton was being denied his meals due to being restricted from the prison dining hall while wearing shower shoes. (Complaint at 23.) He states that neither McBride nor Richardson took an initiative to ensure that he received his meals. (Complaint at 23.) As a result, Shelton states, he was denied 16 meals. (Complaint at 23.) Shelton states he filed Complaints with Anderson and Sharpe about not receiving his meals, but "both of these defendants tacitly authorized McBride['s] and Richardson['s] inactions." (Complaint at 23.) Shelton states that he was forced to eat a soup a day out of his commissary purchase instead of receiving meals from the prison dining hall, causing weight loss, dizziness, nausea, stomach cramps and pain. (Complaint at 23-24.)

Shelton states that the actions of Kanode, Coleman, Northrup, Ridge, Crosby, Morton and Joyce in denying him access to the prison dining hall while wearing shower shoes, resulting in the denial of 62 meals, violated his Eighth Amendment right to be free from cruel and unusual punishment. (Complaint at 27-28.) Shelton further states that the actions of McBride, Sharpe, Richardson and Anderson tacitly authorized Felts's decision to confiscate Shelton's sneakers, denying him access to the prison dining hall for 16 meals, also violated his Eighth Amendment right to be free from cruel and unusual punishment. (Complaint at 28.) Shelton also states that the actions of Anderson, Sharpe, Hall and Felts in confiscating his sneakers and causing him to walk around the prison with only socks on his feet subjected him to swelling and pain in his feet and amounted to deliberate indifference to his serious orthopedic conditions and subjected him to

cruel and unusual punishment in violation of the Eighth Amendment. (Complaint at 28-29.) Shelton also states that Snow, in the role of Grievance Coordinator, intentionally interfered with his opportunity to exhaust his administrative remedies, in violation of his First and Eighth Amendment rights. (Complaint at 29-30.) Shelton seeks compensatory and punitive damages. (Complaint at 30-33.)

In support of their Motion, the defendants have offered Affidavits from Green Rock D Building Unit Manager Crosby, River North Institutional Grievance Coordinator S. Sutfin, Northrup, former Major and Chief of Security at Green Rock, Green Rock Registered Head Nurse S. Reaves and River North Major and Chief of Security Sharpe. (Docket Item Nos. 144-1 to 144-5.)

In Crosby's Affidavit, (Docket Item No. 144-1) ("Crosby Affidavit"), Crosby states that he became the Unit Manager of the D Building at Green Rock in December 2023. (Crosby Affidavit at 1.) Crosby states that he was a Lieutenant at Green Rock during the period of time from June 21 through August 2021, when Shelton alleges he was denied access to the prison dining hall because he was not wearing state-issued shoes. (Crosby Affidavit at 1.) Crosby states that VDOC records indicate that Shelton was incarcerated at Green Rock from November 6, 2019, to October 8, 2021, when he was transferred to River North. (Crosby Affidavit at 1.) Crosby states that Shelton was held in segregation housing from June 21 to 22, 2021, and his meals would have been delivered to his cell. (Crosby Affidavit at 2.) Crosby states that Shelton was released to general population status on June 22, 2021, and remained on that status until being assigned again to segregation on September 13, 2021. (Crosby Affidavit at 2.)

–8–

Crosby states that he spoke with Shelton about his shoes in June 2021 and informed Shelton that he could not enter the dining hall in open-toe shoes. (Crosby Affidavit at 2.) Crosby states that Shelton was offered state footwear, which he declined. (Crosby Affidavit at 2.) Crosby states that wearing shower shoes to the dining hall was a sanitation and hygiene issue and posed a safety concern with open-toe shoes outside in rain and bad weather. (Crosby Affidavit at 2.) Crosby states that Shelton told him he was denying him access to the dining hall, to which Crosby responded that he was not denying Shelton access, in that Shelton simply had to wear the proper footwear to go to the dining hall. (Crosby Affidavit at 2.)

Crosby states that security and nonmedical staff do not make medical decisions and do not determine if an inmate needs or requires medical shoes. (Crosby Affidavit at 3.) Crosby states that the institutional doctor prescribes medically necessary shoes for inmates, and neither he, nor nonmedical staff, have any involvement in making medical decisions of any kind for inmates. (Crosby Affidavit at 3.) Crosby states that security staff rely on the expertise of the institutional doctor regarding an inmate's medical care and treatment, including ordering medical shoes. (Crosby Affidavit at 3.) Crosby states that, without the institutional doctor's order that Shelton have medical shoes, Shelton was obligated to follow all institutional rules and regulations regarding footwear and what is required for going to the dining hall. (Crosby Affidavit at 3.) Had a medical order been entered for Shelton to wear medical shoes, Crosby states, that order would have been honored. (Crosby Affidavit at 3.) From his recollection, Crosby states, a medical order was never entered for Shelton to wear medical shoes while housed at Green Rock. (Crosby Affidavit at 3.)

In Sutfin's Affidavit, (Docket Item No. 144-2) ("Sutfin Affidavit"), it states that Sutfin has been the Grievance Coordinator at River North since 2024 and, as such, is responsible for maintaining the grievance files at the prison. (Sutfin Affidavit at 1.) Sutfin states that VDOC Operating Procedure, ("OP"), 866.1, Offender Grievance Procedure, provides a mechanism for offenders to resolve complaints, appeal administrative decisions and challenge the substance of procedures and provides corrections administrators a means to evaluate potential problem areas, and, if necessary, correct those problems in a timely manner. (Sutfin Affidavit at 2.) A copy of OP 866.1, which was in effect at the time of Shelton's River North allegations, is attached to Sutfin's Affidavit as Enclosure A. (Sutfin Affidavit at 7-23.)

Sutfin states that all issues are grievable except those pertaining to policies, procedures and decisions of the Virginia Parole Board, issues related to institutional disciplinary hearings, state and federal court decisions, laws and regulations and matters beyond the control of the VDOC. (Sutfin Affidavit at 2.) Sutfin states that each inmate is entitled to use the grievance procedure for problem resolution, and reprisals are not imposed upon inmates for filing grievances in good faith. (Sutfin Affidavit at 2.) Pursuant to OP 866.1, Sutfin states, an inmate properly exhausts his administrative remedies by timely filing a Regular Grievance at the institutional level and appealing that Regular Grievance through all applicable levels of review. (Sutfin Affidavit at 2.) Prior to filing a Regular Grievance, Sutfin states, an inmate must demonstrate that he made a good faith effort to informally resolve his complaint by using the Informal Complaint Process. (Sutfin Affidavit at 2.) The Informal Complaint Process involves an inmate submitting both a verbal complaint, and, if the issue remains unresolved or

the inmate is not satisfied, the inmate submits an Informal/Written Complaint. (Sutfin Affidavit at 2.)

Pursuant to OP 866.1, Informal/Written Complaints must be filed within 15 days of the incident. (Sutfin Affidavit at 3.) Staff have 15 days to respond to the Informal/Written Complaint. (Sutfin Affidavit at 3.) If an inmate is dissatisfied with the staff response, or if 15 days have passed without a response, an inmate may file a Regular Grievance. (Sutfin Affidavit at 3.) Regular Grievances must be filed within 30 calendar days from the date of the incident. (Sutfin Affidavit at 3.) OP 866.1 requires an inmate to attach a copy of his Written Complaint to his Regular Grievance. (Sutfin Affidavit at 3.) If a Regular Grievance does not meet the filing requirements of OP 866.1, it is returned to the inmate within two working days, with the reason for return completed on the intake section of the Grievance form. (Sutfin Affidavit at 3.)

According to Sutfin, copies are made of all Regular Grievances returned to inmates with the justification for the return noted on the second page of the form. (Sutfin Affidavit at 3.) If an inmate wishes review of an intake decision on a Regular Grievance, he may send the Regular Grievance to the Regional Ombudsman for review. (Sutfin Affidavit at 3.) There is no further review of an intake decision. (Sutfin Affidavit at 3-4.) Appealing an intake decision does not satisfy the exhaustion requirement. (Sutfin Affidavit at 4.)

If a Regular Grievance is accepted during the intake process, there are three possible levels of review. (Sutfin Affidavit at 4.) Level I reviews are conducted by the Warden or Superintendent of the prison. (Sutfin Affidavit at 4.) If an inmate is

dissatisfied with the determination at Level I, he may appeal the determination to Level II. (Sutfin Affidavit at 4.) For most issues, Level II is the final level of review. (Sutfin Affidavit at 4.) For those issues appealable to Level III, the Deputy Director or Director of the VDOC conducts the review. (Sutfin Affidavit at 4.) The time limit for issuing a Level I response is 30 days and 20 days for a Level II response. (Sutfin Affidavit at 4.) Expiration of the time limit without a response at any stage automatically qualifies the Regular Grievance for appeal to the next stage. (Sutfin Affidavit at 4.)

An inmate may file an Emergency Grievance if he believes that there is a situation or condition which may subject him to immediate risk of serious personal injury or irreparable harm. (Sutfin Affidavit at 4.) The filing of an Emergency Grievance, however, does not satisfy the exhaustion requirement. (Sutfin Affidavit at 4.)

According to Sutfin, based on her review of Shelton's grievance records, Shelton did not submit an Informal/Written Complaint or Regular Grievance complaining that he was forced to wear only socks at River North because he did not have medical shoes. (Sutfin Affidavit at 4.) Sutfin states that this was a grievable issue. (Sutfin Affidavit at 4.) Therefore, Sutfin states, Shelton did not fully exhaust his administrative remedies regarding these allegations. (Sutfin Affidavit at 4-5.)

Sutfin states that Shelton did submit an Informal/Written Complaint, Log No. RNCC-21-INF-01531, dated November 6, 2021, complaining that Felts responded to an email from Nurse Crawford that Shelton's shoes were not medical

and were purchased from an outside vendor, in violation of policy. (Sutfin Affidavit at 5.) Felts responded to this Written Complaint on November 17, 2021, stating that the shoes were purchased through Union Supply and could be purchased by anyone without a medical condition. (Sutfin Affidavit at 5.) Felts further responded that all inmate shoes must be purchased through the commissary and not an outside vendor; he told Shelton his shoes would not be returned. (Sutfin Affidavit at 5.) A copy of Informal/Written Complaint, Log No. RNCC-21-INF-01531, is attached to the Sutfin Affidavit as Enclosure B. (Docket Item No. 144-2 at 24.) According to Sutfin, Shelton did not submit a Regular Grievance regarding this Complaint, which was a grievable issue. (Sutfin Affidavit at 5.) Therefore, Sutfin states, Shelton did not fully exhaust his administrative remedies regarding this allegation. (Sutfin Affidavit at 5-6.)

In Northrup's Affidavit, (Docket Item No. 144-3) ("Northrup Affidavit"), Northrup states that he previously worked as a Major and Chief of Security at Green Rock. (Northrup Affidavit at 1.)  According to Northrup, VDOC records indicate that Shelton was incarcerated at Green Rock from November 6, 2019, to October 8, 2021, when he was transferred to River North. (Northrup Affidavit at 2.) Northrup states that all VDOC inmates are provided with state-issued shoes and a pair of shower shoes, flip flops. (Northrup Affidavit at 2.) The state-issued shoes are canvas covered sneakers. (Northrup Affidavit at 2.)

Northrup states that he recalls that Shelton frequently told him that he needed medical shoes for his foot. (Northrup Affidavit at 2.) He states that Shelton believed that he should have been allowed to wear his shower shoes to the dining hall whenever he wanted. (Northrup Affidavit at 2.) According to Northrup,

Shelton began a hunger strike soon after his arrival at Green Rock on November 6, 2019. (Northrup Affidavit at 2.) Incident Report No. IIR-GROC-2019-001099, dated November 12, 2019, reporting that Shelton had gone on a hunger strike to force the Medical Department to treat him appropriately, is attached to the Northrup Affidavit as Enclosure A. (Northrup Affidavit at 8.) Northrup states that Shelton was placed in the RHU for close monitoring while on the hunger strike. (Northrup Affidavit at 2.) On November 16, 2019, it was determined that Shelton had consumed three consecutive meals, and, therefore, hunger strike precautions were discontinued. (Northrup Affidavit at 2.) This is documented in Internal Incident Report No. IIR-GROC-2019-001124, dated November 16, 2019, which is attached to the Northrup Affidavit as Enclosure B. (Northrup Affidavit at 2, 9.)

Northrup states that his many interactions with Shelton at Green Rock centered around Shelton's belief that he should have medical shoes for his foot. (Northrup Affidavit at 2.) After Shelton's arrival at Green Rock in the fall of 2019, Northrup states, Northrup told Shelton he would allow him to wear RHU Crocs while he attempted to get things sorted out with the Medical Department about the medical shoes. (Northrup Affidavit at 2-3.)  Northrup states that his expectation was that Shelton would sign up for sick call and make an appointment with the institutional physician, and, if the physician determined that medical shoes were necessary, an order for those shoes to be provided to Shelton would be entered by the physician. (Northrup Affidavit at 3.) Northrup states that he allowed Shelton to wear the Crocs to the dining hall to give him the opportunity to see medical staff. (Northrup Affidavit at 3.) Northrup states that he told Shelton that this was not a permanent situation because RHU Crocs are not an item issued to inmates in general population. (Northrup Affidavit at 3.) Northrup states that shower shoes

–14–

could not be worn due to sanitation, hygiene and safety issues. (Northrup Affidavit at 3.) Northrup states that ordering medical shoes was up to the institutional doctor, and he had no involvement or authority to order medical shoes for any inmate. (Northrup Affidavit at 3.) Northrup states that, by May 2021, it was clear that a medical order had not been entered by the institutional physician for Shelton to wear medical or special shoes, and, therefore, Shelton was told that he could not continue to wear inappropriate footwear to the dining hall to pick up his meals. (Northrup Affidavit at 3.)

Northrup states that VDOC records indicate that Shelton was placed in RHU on May 12, 2021, at 3:47 p.m. and released from RHU the following day, May 13, 2021, at 10:45 a.m. and returned to general population. (Northrup Affidavit at 3.) Northrup states that the document attached to his Affidavit as Enclosure C is a copy of Shelton's bed history. (Northrup Affidavit at 3, 10-13.) When Shelton was released from RHU on May 13, Northrup states, he was provided a pair of state canvas shoes to wear and told that he could not wear his shower shoes to the dining hall. (Northrup Affidavit at 4.) Northrup states that he discarded the Crocs that he had issued to Shelton because they were no long serviceable. (Northrup Affidavit at 4.) Northrup states that Shelton's assignment to RHU was not retaliatory, but was to make clear to Shelton that he could no longer wear shower shoes throughout Green Rock and needed to wear the state-issued shoes. (Northrup Affidavit at 4.)

Northrup states that Shelton was assigned to general population status from June 22, 2021, to September 13, 2021, when he was assigned to segregation. (Northrup Affidavit at 4.) During that period of time, general population inmates

would walk to the dining hall, enter the building, receive their meal trays, exit the building and return to their housing unit to eat their meals. (Northrup Affidavit at 4.) These were referred to as "grab and go" meals, and all three meals a day were served "grab and go" style. (Northrup Affidavit at 4.) Northrup states because Shelton was assigned to general population during the summer of 2021, he was required to go to the dining hall to pick up his meals. (Northrup Affidavit at 4.) There was no meal delivery to the housing units for inmates assigned to general population, Northrup states. (Northrup Affidavit at 4.) According to Northrup, there was no tracking system in place to monitor whether general population inmates went to the dining hall to pick up their meals. (Northrup Affidavit at 4.) Northrup states if Shelton decided that wearing his shower shoes was more important than going to pick up a meal, that was his choice. (Northrup Affidavit at 4.) Northrup states, there was not a medical order for Shelton to wear any medical or special shoes at Green Rock, and no one denied him access to the dining hall. (Northrup Affidavit at 5.) Northrup states that he has no way of knowing if and/or when Shelton failed to pick up his meals at the dining hall during the summer of 2021. (Northrup Affidavit at 4-5.) During this period of time, Northrup states, Shelton would, on occasion, show up at the dining hall wearing shower shoes, and he was denied entrance to the dining hall. (Northrup Affidavit at 5.) However, on these occasions, officers would enter the dining hall and retrieve a food tray and give it to Shelton to take back to his housing unit. (Northrup Affidavit at 5.)

During this period, Northrup states, inmates had access to the institutional commissary and could purchase an assortment of food items on a weekly basis. (Northrup Affidavit at 5.) According to Northrup, commissary records from July 1, 2021, through October 5, 2021, document that Shelton purchased many food items

from the commissary on a weekly basis. (Northrup Affidavit at 5.) These food items included cookies, crackers, summer sausages, chips, candy, tuna, mackerel, pepperoni, rice noodles, ramen and peanut butter. (Northrup Affidavit at 5.) There were weeks when Shelton's commissary order totaled more than $100 per week. (Northrup Affidavit at 5.) Northrup states Shelton kept this food in his cell and, therefore, he had food available during the time he alleges that he did not go to the dining hall to pick up his meals. (Northrup Affidavit at 5.) Copies of Shelton's Green Rock commissary records are attached as Enclosure D to the Northrup Affidavit. (Northrup Affidavit at 14-25.)

Northrup states that he does not know if Shelton lost any weight during the summer of 2021. (Northrup Affidavit at 5.) Northrup states that security and nonmedical staff at Green Rock do not make medical decisions and do not determine if an inmate needs or requires medical shoes. (Northrup Affidavit at 5.) The institutional doctor prescribes medically necessary shoes for an inmate, and neither Northrup nor nonmedical staff have any involvement in making medical decisions of any kind for inmates. (Northrup Affidavit at 5-6.) Northrup states that security and nonmedical staff rely on the expertise of the institutional doctor regarding an inmate's medical care and treatment, including ordering medical shoes. (Northrup Affidavit at 6.) If an inmate has a medical order from the institutional doctor for medical shoes, the inmate is permitted to have medical shoes, Northrup states. (Northrup Affidavit at 6.) Without a medical order for medical or special shoes, an inmate is required to follow all institutional rules and regulations regarding what footwear is appropriate to wear at Green Rock, including in the dining hall. (Northrup Affidavit at 6.)

Northrup states that he responded to Shelton's Written Complaint, Log No. GROC-21-INF-00769, on June 29, 2021, complaining that he and other security officers had prevented Shelton from eating his meals because he was not wearing state-issued boots. (Northrup Affidavit at 6, 27.) According to Northrup, Shelton submitted a Regular Grievance, Log No. GROC-21-REG-00082, dated June 29, 2021, complaining that from November 24, 2019, to June 23, 2021, Northrup had directed the security staff to allow Shelton to enter the dining hall wearing Crocs, which Northrup had provided for use until the court had decided whether Dr. Wang had deprived Shelton of medical orthopedic boots. (Northrup Affidavit at 6, 26.) Shelton complained that Northrup was denying him meals for failing to wear the proper footwear. (Northrup Affidavit at 6.) Warden Kanode responded to Shelton's Grievance at Level I on July 29, 2021, and determined it was unfounded. (Northrup Affidavit at 30-31.)   Kanode noted that Shelton had been advised numerous times to wear proper footwear to the dining hall to obtain his daily meals. (Northrup Affidavit at 6, 30.) He also noted that Assistant Warden Coleman had spoken with Shelton, and they had agreed to allow Shelton to order shoes on July 22, 2021. (Northrup Affidavit at 6.) Shelton appealed the Level I response to Level II, and Regional Administrator Manis upheld the Level I response on August 26, 2021. (Northrup Affidavit at 7.) A copy of Regular Grievance, Log No. GROC-21-REG-00082, is attached as Enclosure E to the Northrup Affidavit. (Northrup Affidavit at 26-31.)

Northrup states that he made reasonable efforts to assist Shelton by allowing him to wear Crocs to the dining hall for a period of time to resolve his alleged foot issue with the medical staff and institutional doctor. (Northrup Affidavit at 7.) Because a medical order was not entered for Shelton to wear medical shoes at

Green Rock, Northrup states he determined that Shelton needed to wear state-issued footwear to enter the dining hall. (Northrup Affidavit at 7.) Northrup states he tried to accommodate Shelton and, at no time, did he retaliate against Shelton or conspire with other staff to deny Shelton access to the dining hall. (Northrup Affidavit at 7.)  Northrup states that, had a medical order been entered for Shelton to wear medical shoes, that order would have been honored. (Northrup Affidavit at 7.) Northrup states no such medical order was ever entered. (Northrup Affidavit at 7.)

In the Affidavit of S. Reaves, R.N., Head Nurse at Green Rock, ("Reaves"), Reaves states that she reviewed Shelton's relevant medical records to determine if he had a medical order for orthopedic shoes while housed at Green Rock and to determine if his weight was noted. (Docket Item No. 144-4, ("Reaves Affidavit"), at 1.) Reaves states the VDOC records document that Shelton was incarcerated at Green Rock from November 6, 2019, to October 8, 2021, when he was transferred to River North. (Reaves Affidavit at 1.) According to Reaves, based on her review of Shelton's medical records, Shelton did not have an active medical order from the Green Rock institutional doctor for any type of medical shoe while he was incarcerated there. (Reaves Affidavit at 2.) Furthermore, Reaves states, the following weights were noted in Shelton's medical records:

| | | |
|---|---|---|
| 11/12/2019 | 197.8 lbs | pre hunger strike |
| 11/14/2019 | 198 lbs | |
| 11/16/2019 | 193.2 lbs | hunger strike ended |
| 7/10/2020 | 209.6 lbs | |
| 10/08/2021 | 223 lbs | as noted on Intra-system Transfer Medical Review, DOC 726-B, completed upon Shelton's arrival at [River North] |

12/3/2021          216 lbs          taken at [River North]

(Reaves Affidavit at 2.) A copy of Shelton's medical records for the period of November 6, 2019, to February 14, 2022, including the Intra-system Transfer Medical Review, DOC 726-B, is attached to the Reaves Affidavit as Enclosure A. (Reaves Affidavit at 4-42.)

In the Affidavit of H. Sharpe, Major and Chief of Security at River North, Sharpe states that VDOC records show that Shelton was received at River North on October 8, 2021, and was incarcerated there until September 16, 2022, when he was transferred to Wallens Ridge State Prison. (Docket Item No. 144-5, ("Sharpe Affidavit"), at 1.) Sharpe states that, when Shelton arrived at River North, the property officer confiscated unauthorized personal shoes from him. (Sharpe Affidavit at 2.) Sharpe states the shoes were confiscated because they were not state-issued shoes, and they had been purchased from an unauthorized vendor and, therefore, were considered contraband. (Sharpe Affidavit at 2.)

Sharpe states all VDOC inmates are provided with state-issued shoes, which are canvas covered sneakers. (Sharpe Affidavit at 2.) Sharpe states that Shelton arrived at River North with a pair of state-issued shoes and a pair of state-issued shower shoes. (Sharpe Affidavit at 2.) A copy of Shelton's Personal Property Inventory sheet from October 2021 is attached to the Sharpe Affidavit as Enclosure A. (Sharpe Affidavit at 6-10.) Sharpe states that he told Shelton that neither he nor any of the nonmedical staff at River North make medical decisions or determine if an inmate needs special or orthopedic shoes. (Sharpe Affidavit at 2.) Sharpe states it is the institutional doctor who has the authority to prescribe medically necessary

shoes for an inmate. (Sharpe Affidavit at 2-3.) Sharpe states he does not have that authority, and he and security staff rely on the expertise of the institutional doctor regarding an inmate's medical care and treatment, including ordering special medical shoes. (Sharpe Affidavit at 3.) Sharpe states that the security staff, including property officers, would abide by any doctor's order if an inmate had a medical order from the institutional doctor. (Sharpe Affidavit at 3.)

Sharpe states that Shelton did not have a physician's order for medical or special shoes while housed at River North. (Sharpe Affidavit at 3.) He said that security staff could not just take Shelton's word that he was supposed to have special or medical shoes. (Sharpe Affidavit at 3.) Without an order from the institutional doctor for medical shoes, Sharpe states, Shelton was obligated to follow all institutional rules and regulations regarding footwear. (Sharpe Affidavit at 3.)

Sharpe states, in December 2021, inmates at River North went to the dining hall and picked up their meals and took them back to their housing units to eat. (Sharpe Affidavit at 3.) These "grab and go" meals were served three times a day. (Sharpe Affidavit at 3.) Sharpe states that Shelton was in general population at the time, and it was his choice to pick up his meals or not. (Sharpe Affidavit at 3.) Sharpe states that no one denied Shelton meals in December 2021. (Sharpe Affidavit at 3.) If Shelton did not want to follow institutional rules that required him to wear appropriate footwear to the dining hall, Sharpe states, that was Shelton's choice. (Sharpe Affidavit at 3.) Sharpe states proper footwear in the dining hall is important for health, safety and hygiene purposes. (Sharpe Affidavit at 3.)

Sharpe states that Shelton submitted Informal/Written Complaint, Log No. RNCC-21-INF-01782, dated December 11, 2021, complaining that McBride and Richardson were aware that he was waiting to receive medical boots and that he was wearing flip flops in the meantime. (Sharpe Affidavit at 3.) Shelton claimed that he had missed 16 meals since December 7, 2021, because he was prohibited from wearing shower shoes in the dining hall. (Sharpe Affidavit at 3.) Sharpe responded to this Informal Complaint on December 21, 2021, and advised Shelton that he would receive a pair of "canvas (state) shoes" to wear until he received his medical shoes. (Sharpe Affidavit at 3.)  Sharpe states that Shelton filed a Regular Grievance, Log No. RNCC-22-REG-00003, dated January 2, 2022, complaining that he missed 16 meals and suffered weight loss and had stomach pains because he was not allowed in the dining hall while wearing flip flops. (Sharpe Affidavit at 4.) Shelton requested that his meals be brought to him until he received his medical shoes. (Sharpe Affidavit at 4.) Warden Anderson provided the Level I response to this Grievance on January 6, 2022, and advised Shelton that there was no medical order written by the doctor stating that Shelton could not wear state-issued boots. (Sharpe Affidavit at 4.) The response also stated that Sharpe had approved Shelton having a pair of canvas state shoes to wear until he received medical shoes. (Sharpe Affidavit at 4.) Warden Anderson referred Shelton to the River North Inmate Orientation Manual, which states, "Inmates are only authorized to wear one set of state-issued clothing and shoes to the dining halls. …." (Sharpe Affidavit at 4.) Anderson found Shelton's Regular Grievance unfounded and wrote, "It is your responsibility to comply with any and all rules and regulations within[] the facility. … State boots were supplied to you, and you do not have a Medical Order stating that you cannot wear them. Staff performed their duties correctly and if you missed 16 meals as you state, it was by your own choice for not wearing the state boots."

(Sharpe Affidavit at 4.) Shelton appealed this Regular Grievance to Level II. (Sharpe Affidavit at 4.) A copy of Regular Grievance, Log No. RNCC-22-REG-00003, is attached to the Sharpe Affidavit as Enclosure B. (Sharpe Affidavit at 15-22.)

Shelton has filed a number of affidavits in opposition to the Motion. In Affidavit Exhibit 1, (Docket Item No. 155-1) ("Shelton Affidavit 1"), Shelton states that VDOC OP 720.2 requires that a medical screening should be performed to determine if an inmate has a disability, and, if a disability is diagnosed, a qualified health care practitioner or specialist will determine the level of medical accommodations needed and provide appropriate medical treatment. (Shelton Affidavit 1 at 3.) Shelton further states that this OP requires that orthotics will be made available only by order of a VDOC health care practitioner. (Shelton Affidavit 1 at 3.) Shelton states that OP 720.2 requires an intake health screening be performed by health-trained or qualified health personnel upon each inmate's arrival at a facility. (Shelton Affidavit 1 at 3.)

Shelton states that VDOC OP 750.3 requires orthotics to be provided to an inmate if the failure to do so would result in deterioration of the inmate's health while incarcerated in the VDOC. (Shelton Affidavit 1 at 7.) Also, OP 750.3 requires that inmates with prior foot surgeries be referred to the Medical Department for evaluation for special shoes. (Shelton Affidavit 1 at 7.)

In Affidavit Exhibit II, (Docket Item No. 155-3) ("Shelton Affidavit 2"), Shelton states that, from 1991 to 2007, while a VDOC inmate, he was provided special boots on the recommendation of Dr. Henceroth, VDOC orthopedic

physician. (Shelton Affidavit 2 at 1.) Shelton states that, when he re-entered the VDOC at Coffeewood Correctional Center, it was noted that he had foot surgery on his left foot previously.  (Shelton Affidavit 2 at 2.) Several months later, Shelton states, he was transferred to Haynesville Correctional Center and seen by Dr. Levin, Facility Physician, due to the worsening orthopedic condition of his right foot. (Shelton Affidavit 2 at 2.) On June 10, 2019, Shelton states, he was seen by a specialist, and it was recommended that surgery be performed on his right foot. (Shelton Affidavit 2 at 2.)  Shelton states that this surgery, as well as a recommendation for orthopedic boots, was approved by the Health Services Director for Armor Correctional Health Services, Inc., a VDOC contracted entity, sometime after June 18, 2019. (Shelton Affidavit 2 at 3.)  Shelton had surgery on this right foot on August 2, 2019, and a permanent steel plate and screws were inserted in his right great toe and a wire inserted in his second toe. (Shelton Affidavit 2 at 3.)

Attached to the Shelton Affidavit 2 as Enclosure A is a QMC Consultation Request, dated March 19, 2019, requesting a podiatric or orthopedic surgical consult for Shelton for hammertoes and bunions. (Docket Item No. 155-4 at 1.) The name of the referring physician is marked out on the document. The document states: "…State boots abraid [right] hammertoes and bunions." (Docket Item No. 155-4 at 1.)  Also attached to this Affidavit as Enclosure D is a Health Services Consultation Report form, dated June 10, 2019, completed by a consulting physician, whose signature is not legible, recommending surgery on Shelton's right foot and a soft high top boot with some type of orthotic. (Docket Item No. 155-4 at 5.) Another of these forms, dated June 18, 2019, and completed by a consulting physician, whose signature also is not legible, is attached as Enclosure E. (Docket

Item No. 155-4 at 6.) On this form, the physician recommended Shelton receive orthopedic boots to fit from Powell.  Also attached to this Affidavit is a Lunenburg Correctional Center, ("Lunenburg"), Health Services Complaint and Treatment Form containing a note, dated June 10, 2019, stating that Shelton had been seen at the Medical College of Virginia Orthopedic Clinic, and it was recommended that he receive orthopedic boots from Powell. (Docket Item No. 155-4 at 8.) An attached surgical note shows that Shelton had surgery to repair the problems with his right foot on August 2, 2019. (Docket Item No. 155-4 at 9-12.)

In Affidavit Exhibit III, (Docket Item No. 155-5) ("Shelton Affidavit 3"), Shelton states that he had a consultative evaluation with Powell to be fitted for orthopedic booth with orthotics on July 1, 2019. (Shelton Affidavit 3 at 1.) Shelton states that he returned to Powell on September 16, 2019, for delivery and final fitting of these boots, but, due to swelling and associated pain in his right foot, the appointment was to be rescheduled to another date. (Docket Item No. 155-5 at 2.) Shelton states that he was transferred from Lunenburg to Green Rock before he could return to Powell to receive these boots. (Docket Item No. 155-5 at 3.) Attached to this Affidavit as Enclosure A is Patient Note from Powell, dated July 1, 2019, showing an evaluation of Shelton for orthopedic boots and custom foot orthotics. (Docket Item No. 155-6 at 2.) Attached to this Affidavit as Enclosure C is a Patient Note from Powell, dated September 16, 2019, showing that Shelton was seen, but his boots could not be fitted due to swelling and pain. (Docket Item No. 155-6 at 11.)

In Affidavit Exhibit IV, (Docket Item No. 155-7) ("Shelton Affidavit 4"), Shelton states that he initiated a hunger strike several days after his arrival at Green

Rock in November 2019 because he wanted medical officials to refer him back to Powell to pick up his orthopedic boots. (Shelton Affidavit 4 at 1.) He states: "The hunger strike was meant to force high ranking officials for the [VDOC] to get involve[d] and enforce the departmental procedures dealing with reasonable accommodations for disabled prisoner[]s…." (Shelton Affidavit 4 at 2.) Shelton states that the Interdisciplinary Intervention Management Committee met to discuss his hunger strike on November 13, 2019. (Shelton Affidavit 4 at 2.) Shelton notes that defendants Morton and Crosby were members of this Committee and attended this meeting. (Shelton Affidavit 4 at 2.) A second meeting of this Committee concerning Shelton's hunger strike occurred on November 18, 2019, and, according to Shelton, Crosby attended that meeting. (Shelton Affidavit 4 at 2.)

Shelton also filed a copy of a VDOC Mental Health Hunger Strike Protocol Complaint and Treatment form for him, dated November 13, 2019. (Docket Item No. 155-8 at 1-2.) This form documents that the Hunger Strike Interdisciplinary Intervention/Management Committee met on November 13, 2019, as Shelton approached 120 hours without eating. (Docket Item No. 155-8 at 1.) This form notes that Crosby and Morton were present. (Docket Item No. 155-8 at 1.) Sergeant J. Waller reported that Shelton was conducting the hunger strike to get medical attention for his foot for a special boot. (Docket Item No. 155-8 at 1.) According to this form, Shelton had no documented mental health diagnosis and took no psychotropic medication. (Docket Item No. 155-8 at 1.)

Shelton also filed a copy of a VDOC Mental Health Hunger Strike Protocol Complaint and Treatment form for him, dated November 18, 2019. (Docket Item No. 155-8 at 5.) This form documents that the Hunger Strike Interdisciplinary

Intervention/Management Committee met on November 18, 2019. (Docket Item No. 155-8 at 5.) This form notes that Crosby was present. (Docket Item No. 155-8 at 5.) The form states that Shelton accepted and ate all three meal trays on November 16, 2019, and, therefore, "a potential health concern no longer exists." (Docket Item No. 155-8 at 5.)

In Affidavit Exhibit V, (Docket Item No. 155-9) ("Shelton Affidavit 5"), Shelton states that he submitted an Offender Request form on June 24, 2021, to the attention of the Green Rock Mental Health Department, advising them that, beginning June 22, 2012, he was being denied entry into the dining hall to receive his meals. (Shelton Affidavit 5 at 1-2.) Shelton states that he informed Mental Health that he was not participating in a hunger strike and was eating a soup a day from his commissary purchases. (Shelton Affidavit 5 at 2.) A copy of this Offender Request was attached as Enclosure A. (Docket Item No. 155-10 at 1.) This Offender Request, dated June 24, 2021, is directed to Mental Health and states: "Please be advised of the fact that I am being denied entry to the prison dining hall; so therefore, I have not received a food tray since 6/22/21. But I am eating one (1) soup a day from my own food box in the cell to maintain until security/administration staff find a solution." (Docket Item No. 155-10 at 1.)

Also attached is a copy of a Mental Health Services Progress Notes form with an interaction time of 2:09 p.m. on June 28, 2021. (Docket Item No. 155-10 at 2.) This Note documents that a Psychology Associate spoke with Shelton, who stated that he was being denied entry to the dining hall because he refused to wear state-issued boots. (Docket Item No. 155-10 at 2.) According to this Note, Shelton said that, if he put the state-issued boots on, his lawsuit to get orthopedic shoes

would be dismissed, so he had chosen not to wear the state-issued boots. (Docket Item No. 155-10 at 2.) It was noted that Shelton's behavior and speech rate, volume and fluency were within normal limits. (Docket Item No. 155-10 at 2.) The note reflects that Shelton's mood was euthymic, his affect was full, his thought process was linear and logical and no abnormal thought content was noted. (Docket Item No. 155-10 at 2.) Shelton was not experiencing any perceptual disturbances or hallucinations. (Docket Item No. 155-10 at 2.) His memory/cognition was alert; he was oriented to person, place time and situation; and his recent memory was intact. (Docket Item No. 155-10 at 2.) His insight was marginal; his judgment was fair; and his impulse control was fair. (Docket Item No. 155-10 at 2.) The Psychology Associate noted: "Inmate did not present with any clinically significant symptoms during our brief meeting." (Docket Item No. 155-10 at 2.)

In Affidavit Exhibit VI, (Docket Item No. 155-11) ("Shelton Affidavit 6"), Shelton states he filed an Emergency Grievance at Green Rock on June 22, 2021, complaining that defendant Joyce was denying him entry into the dining hall to receive his meals. (Shelton Affidavit 6 at 1-2.) Shelton states that he submitted 28 other Emergency Grievances concerning being repeatedly denied his meals. (Shelton Affidavit 6 at 2.) Shelton states that from June 22 to July 21, 2021, defendants Joyce, Crosby, Northrup, Morton and Ridge either responded to these Emergency Grievances or otherwise had knowledge that he was not receiving his meals, yet they did nothing about it. (Shelton Affidavit 6 at 2.) Shelton states that, on July 8, 2021, Ridge informed him that he would no longer have access to the boulevard to attempt to pick up his meals. (Shelton Affidavit 6 at 3.)

–28–

Shelton attached 22 Emergency Grievance forms to the Shelton Affidavit 6. (Docket Item No. 155-12.) These Emergency Grievance forms are dated from June 28 to July 21, 2021, and each complains that Shelton was denied one or more meals. (Docket Item No. 155-12 at 1-22.) Each of these Emergency Grievances was returned to Shelton with the box checked stating, "Your grievance does not meet the definition for an emergency." (Docket Item No. 155-12 at 1-22.) Many instructed him to file an Informal Complaint. (Docket Item No. 155-12 at 3-4, 6, 11-12, 16-17, 20-22.) Several informed Shelton that shower shoes were not allowed in the dining hall or that he needed to wear state-issued shoes. (Docket Item No. 155-12 at 1-2, 5, 7-10, 13-15, 18.) Defendants Crosby, Northrup, Morton and Ridge responded to one or more of these Emergency Grievance forms.

In Affidavit Exhibit VII, (Docket Item No. 155-13) ("Shelton Affidavit 7"), Shelton states that, on June 29, 2021, Northrup confirmed that he was aware that Shelton was being denied his meals. (Shelton Affidavit 7 at 1.) Thereafter, Shelton states, Northrup confirmed that he was aware that Shelton was restricted from the boulevard to attempt to pick up his meals. (Shelton Affidavit 7 at 2.) Shelton also stated that, on August 2, 2021, Kanode confirmed that he and Coleman were aware that Shelton was being denied meals. (Shelton Affidavit 7 at 2.) Shelton states on July 21, 2021, he entered into an agreement with Coleman to allow Shelton to purchase two pairs of sneakers at his expense from an outside vendor, and Coleman ordered that Shelton's meals be brought to his assigned building until these sneakers arrived. (Shelton Affidavit 7 at 2.) Shelton states that he received a pair of these sneakers, a pair of Skechers, on August 5, 2021. (Shelton Affidavit 7 at 3.)

Shelton attached a copy of Written Complaint GROC-21-INF-769, dated June 28, 2021, to Shelton Affidavit 7. (Docket Item No. 155-14 at 1-2.) Shelton also attached a copy of Written Complaint GROC-21-INF-854, dated July 11, 2021. (Docket Item No. 155-14 at 3-4.) On this form, Shelton complained that Ridge had restricted him from accessing the prison boulevard in his shower shoes on July 8, 2021. (Docket Item No. 155-14 at 3.) Shelton stated that he had been issued the shower shoes by personal property security staff to wear to ambulate around the prison. (Docket Item No. 155-14 at 3.) On July 13, 2021, Northrup responded that shower shoes were intended to be worn only inside an inmate's housing unit, and Northrup offered to assist him in obtaining appropriate footwear. (Docket Item No. 155-14 at 4.) Shelton also attached a copy of Regular Grievance, Log No. GROC-21-REG-00082, dated June 29, 2021, and Kanode's Level I response. (Docket Item No. 155-14 at 5-7.) Shelton also attached Offender Trust System documents and receipts showing that he purchased basketball and cross-training shoes. (Docket Item No. 155-14 at 8-15.)

In Affidavit Exhibit VIII, (Docket Item No. 155-15) ("Shelton Affidavit 8"), Shelton states that when he arrived at River North, he possessed only the property on the Personal Property Inventory marked under the columns "Authorized," "Count" and "Issued." (Docket Item No. 155-15 at 1-2; Docket Item No. 155-16 at 1.) Shelton states that the Personal Property Inventory shows that he arrived at River North with one pair of athletic socks. (Docket Item 155-15 at 2.) Shelton states that none of the other clothing items are marked because he did not arrive at River North with any of those items. (Docket Item 155-15 at 2.) The court notes that, if Shelton's statement is correct, he arrived at River North with no clothing other than one pair of athletic socks. Shelton also states that the Notice of

–30–

Confiscation of Property form he attached to Shelton Affidavit 8 shows that River North confiscated the two pairs of shoes he was allowed to purchase at Green Rock. (Docket Item No. 155-15 at 3; Docket Item No. 155-16 at 7.) Shelton states that Felts removed the Skechers from his feet when he arrived at River North. (Docket Item No. 155-15 at 3.)

In Affidavit Exhibit IX, (Docket Item No. 155-17) ("Shelton Affidavit 9"), Shelton states that, when he arrived at River North on October 8, 2021, his Skechers sneakers were taken off of his feet while being processed, and he was never offered anything as a replacement. (Shelton Affidavit 9 at 1.) Shelton states that he complained that he had nothing to wear on his feet, but nothing was done. (Shelton Affidavit 9 at 2.) Shelton states that, on October 12, 2021, he was assigned temporarily to the quarantine pod, where he filed several Emergency Grievances, complaining about not having anything to wear on his feet, but nothing was done. (Shelton Affidavit 9 at 2.) Shelton attached three of these Emergency Grievances to his Affidavit. (Docket Item No. 155-18 at 1-3.) On one of these Emergency Grievances, Log No. 161733, Unit Manager B. Hall, ("Hall"), responded that Shelton's Grievance did not meet the definition for an emergency. (Docket Item No. 155-18 at 3.) Hall also wrote, "Dr. has entered order for you to be fitted for medical boots." (Docket Item No. 155-18 at 3.) Shelton states that he exhausted his administrative remedies by filing a Written Complaint and Regular Grievance, which he pursued to Level II, about his shoes being confiscated. (Shelton Affidavit 9 at 2.) He states that he cannot provide these forms because they were destroyed by VDOC employees. (Shelton Affidavit 9 at 2-3.) Shelton states that the VDOC paid him $374.00 for the property that was destroyed. (Shelton Affidavit 9 at 3.) He attached a Trust Account Summary showing a

$374.99 deposit into his Trust Account on November 9, 2023, as a "property settlement." (Docket Item No. 155-18 at 5.)

In Affidavit Exhibit X, (Docket Item No. 155-19) ("Shelton Affidavit 10"), Shelton states that, on October 14, 2021, he was seen by River North Facility Physician Dr. T. Mathena, who wrote an order for Shelton to be seen by Bristol Orthotics to be fitted for boots. (Shelton Affidavit 10 at 1-2.) Shelton attached a copy of Dr. Mathena's October 14, 2021, Health Services Complaint and Treatment Form documenting this order. (Docket Item No. 155-20 at 1.) Dr. Mathena's note also requested that property release Shelton's confiscated shoes to allow him to wear them until his could obtain medical boots "if they comply [with] security standards." (Docket Item No. 155-20 at 1.) Shelton also attached an email, noting that Dr. Mathena was requesting that Shelton's shoes be released to him if they met security guidelines, to which the reply stated, "These shoes are not medical; he purchased these from an outside vendor himself. This violates policy and he will have to get shoes from orthotics unless Warden Anderson approves them. …" (Docket Item No. 155-20 at 2.) Shelton also attached Written Complaint RNCC-21-INF-01531, dated November 6, 2021, which complained that Felts's response to Dr. Mathena's email request was false, in that Felts knew that Assistant Warden Coleman and Warden Kanode at Green Rock had approved his purchase of his confiscated shoes. (Docket Item No. 155-20 at 3.) The response states, "You purchased these shoes through Union Supply, not medical. These shoes are not medical shoes. These are shoes that can be purchased by anyone without a medical condition. This violates policy[.] [A]ll shoes must be purchased by the commissary not out side vendor. The shoes are contraband and you will not [receive] them back." (Docket Item No. 155-20 at 3.)

In Affidavit Exhibit XI, (Docket Item No. 155-21) ("Shelton Affidavit 11"), Shelton states that he was seen by a specialist from Bristol Orthotics & Prosthetics, Inc., on November 5, 2021. (Shelton Affidavit 11 at 1.) Shelton states that he received orthopedic tennis shoes the last week of January 2022 and medical boots on May 9, 2022. (Shelton Affidavit 11 at 2.) Shelton attached a Health Services Complaint and Treatment Form for River North Inmate Tyrone Shelton, dated November 5, 2021, and containing an order to be measured for orthopedic shoes and custom inserts. (Docket Item No. 155-22 at 1.) Shelton also attached a Confirmation of Order form, showing that orthopedic boots and tennis shoes had been ordered for him from Bristol Orthotics & Prosthetics, Inc., on November 16, 2021. (Docket Item No. 155-22 at 2.) Also attached is a Receipt for Medical Prosthesis form signed by Shelton, showing receipt of one pair of white tennis shoes with custom inserts. (Docket Item No. 155-22 at 3.) Another Receipt for Medical Prosthesis form, dated May 9, 2022, is attached, showing Shelton received one pair of medical boots. (Docket Item No. 155-22 at 4.)

In Affidavit Exhibit XII, (Docket Item No. 155-23) ("Shelton Affidavit 12"), Shelton states that Dr. T. Mathena, River North Facility Physician, evaluated him on October 14, 2021, and ordered him to be seen by a physical therapist because Shelton never had received the orthopedic boots previously ordered by Dr. Henceroth. (Shelton Affidavit 12 at 1-2.) Shelton states that he was evaluated by S. McBrady, physical therapist, on November 10, 2021, who noted that he was suffering from pain and had difficulty walking due to losing a high percentage of strength in his ankles and loss of arch support. (Shelton Affidavit 12 at 2.) According to Shelton, the physical therapist recommended skill ambulation rehabilitation to strengthen his ankles and build arch support and to train him to

walk correctly. (Shelton Affidavit 12 at 2.) Shelton states the physical therapist noted that he needed orthotics "asap." (Shelton Affidavit 12 at 2.) Shelton attached Physical Therapy Evaluation notes, dated November 10, 2021, stating that he was suffering from right foot pain, unsteadiness of gait, difficulty walking and right foot intrinsic weakness. (Docket Item No. 155-24 at 1-5.) The therapist did note that Shelton needed foot orthotics "ASAP." (Docket Item No. 155-24 at 5.) An attached Physical Therapy Daily Note, dated February 2, 2022, stated that Shelton complained of pain in his feet, which he rated 6.5 out of 10. (Docket Item No. 155-24 at 6.) The Note stated that Shelton had not received his orthotic boots, but molds had been made. (Docket Item No. 155-24 at 6.) An additional attached Physical Therapy Daily Note, dated March 30, 2022, documents that Shelton had received his orthotic shoes, which had helped with his ambulation. (Docket Item No. 155-24 at 7.)

In Affidavit Exhibit XIII, (Docket Item No. 155-25) ("Shelton Affidavit 13"), Shelton states that he initiated filing Emergency Grievances at River North on December 7, 2021, based on his being denied access to the dining hall to pick up his meals. (Shelton Affidavit 13 at 1-2.) Shelton states that McBride and Richardson agreed that it was acceptable to deny him his meals. (Shelton Affidavit 13 at 2.) Shelton states that he filed a Written Complaint and Regular Grievance, and Sharpe and Anderson agreed that the decision to deny Shelton his meals was acceptable. (Shelton Affidavit 13 at 2.) Shelton attached copies of Emergency Grievance Nos. 164046, 164048, 164051, 164052 and 164049. (Docket Item No. 155-26 at 1-5.) In each of these Emergency Grievances, Shelton complained of being denied his meals because he was denied access to the dining hall and/or boulevard while wearing shower shoes. (Docket Item No. 155-26 at 1-5.) Each of

these Emergency Grievances was determined to not meet the definition for an emergency. (Docket Item No. 155-26 at 1-5.) On three of these Emergency Grievances, the response informed Shelton that he had been offered state-issued shoes to wear to the dining hall to pick up his meals, and he chose not to wear them. (Docket Item No. 155-26 at 1-3.) Shelton also attached a copy of Written Complaint, Log No. RNCC-21-INF-01782, dated December 11, 2021, complaining that McBride and Richardson "took the initiative to ensure that [Shelton] receive[s] my three (3) meals daily due to restrictions prohibiting the wearing of shower shoes in the dining hall." (Docket Item No. 155-26 at 6.) Shelton further wrote, "I have missed 16 meals since 12-7-21, and will continue to miss them." (Docket Item No. 155-26 at 6.) Major Sharpe responded on December 21, 2021, "You will receive a pair of canvas (state) shoe[s] to wear until you receive your medical shoes." (Docket Item No. 155-26 at 6.) Shelton also attached a copy of Regular Grievance No. RNCC-22-REG-00003, dated January 2, 2022, on which he stated:

> I missed sixteen (16) meals due to no fault of my own and was subjected to stomach pains, cramps and weight lost due to being denied access to the dining hall while wearing flip flops, this, was enforced by McBride and S. Richardson, who established that flip flops are not allowed in the dining hall and that I would have to wear state issue boots to gain entrance to the dining hall to receive my meals. Medically, I cannot wear state issue boots.

(Docket Item No. 155-26 at 7.) On January 6, 2022, Warden Anderson responded:

> There is not a Medical Order written by the Doctor that states you cannot wear state issued boots. The Major did approve you to have a pair of canvas state shoes to wear until you receive your medical shoes. The RNCC Inmate Orientation Manual states: "Inmates are only authorized to wear one set of state-issued clothing and shoes to the dining halls, Correctional Education, Votech, Intake,

and Medical." It is your responsibility to comply with any and all rules and regulations within the facility. You are responsible for communicating with staff any issues that you cannot comply with. State boots were supplied to you and you do not have a Medical Order stating that you cannot wear them. Staff performed their duties correctly and if you missed 16 meals as you state it was by your own choice for not wearing the state boots.

(Docket Item No. 155-26 at 8.) Anderson determined that Shelton's Regular Grievance was unfounded. (Docket Item No. 155-26 at 8.)

In Affidavit Exhibit XIV, (Docket Item No. 155-27) ("Shelton Affidavit 14"), Shelton states that VDOC OP 801.3, Managing Offenders with Disabilities, states: "… Any offender who believes, they … were discriminated against because of their disability, or decides to appeal their accommodation requests may do so in accordance with Operating Procedure 866.1, Offender Grievance Procedure …. Grievances of … this type (m)ust be initially received by the facility ADA Coordinator, who should consult with the Facility Unit Head and, ultimately, the DOC ADA Coordinator." (Shelton Affidavit 14 at 1-2.)  Shelton Affidavit 14 also notes that OP 866.1 prohibits staff from interfering with the administrative remedies process, and it requires that, when an inmate raises an issue regarding medical care in a Regular Grievance, a copy of the Regular Grievance must be forwarded to the prison's Medical Department. (Shelton Affidavit 14 at 2.) Shelton states that he filed a Regular Grievance on October 26, 2021, attaching a Personal Property Disposition Form, complaining that the sneakers issued to him at Green Rock as an accommodation for his foot problems were confiscated at this arrival at River North. (Shelton Affidavit 14 at 3.)  Shelton states that Snow, the Institutional Ombudsman at River North, did not forward this Regular Grievance to either the

ADA Coordinator or the Medical Department as required. (Shelton Affidavit 14 at 3.)   Shelton states that, during the second week of November 2021, he filed a Written Complaint, and, thereafter, a Regular Grievance, complaining that Snow had intentionally interfered with his efforts to exhaust his administrative remedies against security personnel for denying him access to his sneakers. (Shelton Affidavit 14 at 4.)

Shelton attached a copy of VDOC OP 866.1 to the Shelton Affidavit 14. (Docket Item No. 155-28 at 1-16.)   He also attached a copy of a Regular Grievance, dated October 26, 2021, on which he complained that his medically necessary sneakers were confiscated upon his arrival at River North. (Docket Item No. 155-28 at 17-18.)   This Regular Grievance was rejected at intake because Shelton did not attach a property confiscation form. (Docket Item No. 155-28 at 18.)   Snow dated her rejection on October 28, 2021. (Docket Item No. 155-28 at 18.)   The form also notes that an intake decision was sent back to Shelton on November 3, 2021. (Docket Item No. 155-28 at 18.)   The intake decision was upheld on appeal on November 10, 2021. (Docket Item No. 155-28 at 18.) Shelton also attached a letter to the Regional Ombudsman, stating that he never received a copy of the property confiscation form required at the time that his sneakers were confiscated. (Docket Item No. 155-28 at 19-20.)   Shelton also attached a copy of a Regular Grievance, dated November 3, 2021, on which he complained that Felts had confiscated his sneakers and infringed on his agreement with Wardens Coleman and Kanode to allow him to wear the sneakers. (Docket Item No. 155-28 at 21-22.)   This Regular Grievance was rejected at intake on November 5, 2021, because Shelton did not attach a property confiscation form. (Docket Item No. 155-28 at 22.)   This rejection informed Shelton that he must provide the

confiscation form within five days for his Grievance to be processed. (Docket Item No. 155-28 at 22.)   Shelton apparently resubmitted the Grievance, and, again, it was rejected at intake on November 10, 2021, for an expired filing period. (Docket Item No. 155-28 at 22.)  The intake decision was upheld on appeal on November 19, 2021. (Docket Item No. 155-28 at 22.)   Shelton also attached a copy of a Property Disposition form, dated October 13, 2021, showing he had two pairs of shoes, along with other property, confiscated on October 8, 2021. (Docket Item No. 155-28 at 23.)

In Affidavit Exhibit XV, (Docket Item No. 164) ("Shelton Affidavit 15"), Shelton states that he had requested in discovery, but the VDOC had been unable to provide him with, any documentation showing that he was issued a pair of state canvas shoes on May 13, 2021. (Shelton Affidavit 15 at 3.) Shelton states that VDOC OP 802.1, Inmate and CCAP Probationer/Parolee Property, requires that the Personal Property Officer must enter all state-issued items into the CORIS system. (Shelton Affidavit 15 at 4.) Shelton also states that he never received the state-issued canvas shoes once his Crocs were confiscated on May 13, 2021. (Shelton Affidavit 15 at 5.) He states that he was allowed to walk on the prison boulevard and enter the dining hall from May 13-21, 2021, while wearing his Reebok shower shoes. (Shelton Affidavit 15 at 5.)   Shelton attached a copy of VDOC OP 802.1 to this Affidavit. (Docket Item No. 164-1 at 1-27.)

## II. Analysis

As stated above, this matter is before the court on the defendants' motion for summary judgment. The defendants argue that summary judgment should be

entered in their favor on the following grounds:

1. Defendants Kanode, Coleman, Northrup, Ridge, Crosby, Morton and Joyce at Green Rock and McBride, Felts, Richardson, Sharpe and Anderson at River North did not violate Shelton's Eighth Amendment right to be free from cruel and unusual punishment by denying Shelton access to the prison dining hall because there was no medical order for Shelton to wear orthopedic or special shoes at Green Rock or River North;

2. Defendants Kanode, Coleman, Northrup, Ridge, Crosby, Morton and Joyce at Green Rock and McBride, Felts, Richardson, Sharpe and Anderson at River North are entitled to qualified immunity on Shelton's claim that they violated his Eighth Amendment right to be free from cruel and unusual punishment by denying Shelton access to the prison dining hall while not wearing state-issued shoes;

3. Shelton failed to exhaust his administrative remedies with regard to his claim that defendants Anderson, Sharpe, Hall and Felts confiscated his sneakers upon his arrival at River North and forced him to walk around the prison wearing only socks on his feet;

4. Defendants Anderson, Sharpe, Hall and Felts did not violate Shelton's Eighth Amendment right to be free from cruel and unusual punishment by confiscating his sneakers upon his arrival at River North and forcing him to walk around the prison wearing only socks on his feet; and

5. Shelton's claim that defendant Snow "interfered" with his ability to exhaust his administrative remedies fails to state a cognizable

constitutional claim.

Pursuant to Federal Rules of Civil Procedure Rule 56(a), the court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc), *cert denied*, 498 U.S. 1109 (1991); and *Ross v. Commcn's Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Inc.*, 475 U.S. at 587; *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 850 (4th Cir. 1990); *Ross*, 759 F.2d at 364; *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir. 1980). In other words, the nonmoving party is entitled "to have the credibility of his evidence as forecast assumed." *Miller*, 913 F.2d at 1087 (quoting *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979)). Therefore, in reviewing the defendants' Motion, the court must view the facts and inferences in the light most favorable to the plaintiff.

Based on the evidence before the court, I find that there is no genuine as to any material fact, and Snow is entitled to summary judgment on Shelton's claim that Snow "interfered" with his ability to exhaust his administrative remedies. The Fourth Circuit has held that there is no constitutional right to participate in prison grievance proceedings. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." *Adams*, 40 F.3d at 75. Therefore, Shelton has failed to state a cognizable constitutional claim against Snow, *see DeFour v. White*, 2024 WL 1337203, at *12 (W.D. Va. Mar. 28, 2024) (dismissing inmate's claim that prison employee interfered with grievance procedure by throwing away grievance forms), and summary judgment will be entered in Snow's favor on this claim.

Defendants Anderson, Sharpe, Hall and Felts argue that they are entitled to the entry of summary judgment in their favor on Shelton's claim that they confiscated his sneakers upon his arrival at River North and forced him to walk around the prison wearing only socks on his feet because Shelton failed to exhaust his administrative remedies with regard to this claim.

The Prison Litigation Reform Act of 1995, ("PLRA"), requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. *See* 42 U.S.C. § 1997e(a). It provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory under § 1997e(a), and courts have no

discretion to waive the requirement.  *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "[F]ailure to exhaust is an affirmative defense under the PLRA" and, therefore, must be both pled and proven by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007). A prisoner must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process.  *See Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734). The Supreme Court has instructed that the PLRA "requires proper exhaustion." *Woodford*, 548 U.S. at 93. Proper exhaustion of administrative remedies for PLRA purposes means using all steps that the agency holds out, and doing so properly, including following time limits, so that the agency addresses the issues on the merits.  *See Woodford*, 548 U.S. at 90.

There is no dispute that proper exhaustion under VDOC OP 866.1 requires an inmate to timely file a Regular Grievance at the institutional level and appeal that Regular Grievance through all applicable levels of review. Also, prior to filing a Regular Grievance, an inmate must demonstrate that he made a good faith effort to informally resolve his complaint by using the Informal Complaint Process.

Pursuant to OP 866.1, Informal/Written Complaints must be filed within 15 days of the incident, with staff having 15 days to respond to the Informal/Written Complaint. Regular Grievances must be filed within 30 calendar days from the date of the incident. OP 866.1 requires an inmate to attach a copy of his Written Complaint to his Regular Grievance. If a Regular Grievance does not meet the filing requirements of OP 866.1, it is returned to the inmate within two working days, with the reason for return completed on the intake section of the Grievance

form. If an inmate wishes review of an intake decision on a Regular Grievance, he may send the Regular Grievance to the Regional Ombudsman for review; however, appealing an intake decision does not satisfy the exhaustion requirement. Furthermore, the filing of an Emergency Grievance does not satisfy the exhaustion requirement.

Based on the evidence before the court, I find that there is no genuine dispute of material fact that Shelton failed to fully exhaust his administrative remedies with regard to his claim that he was forced to walk around River North with only socks on his feet. According to Sutfin, based on her review of Shelton's grievance records, Shelton did not submit an Informal/Written Complaint or Regular Grievance complaining that he was forced to wear only socks at River North during October 2021 because he did not have medical shoes. (Sutfin Affidavit at 4.) Sutfin states that this was a grievable issue. (Sutfin Affidavit at 4.) Therefore, Sutfin states, Shelton did not fully exhaust his administrative remedies regarding these allegations. (Sutfin Affidavit at 4-5.)

Sutfin states that Shelton did submit an Informal/Written Complaint, Log No. RNCC-21-INF-01531, dated November 6, 2021, complaining that Felts had responded to an email from Nurse Crawford that Shelton's shoes were not medical and were purchased from an outside vendor, in violation of policy. (Sutfin Affidavit at 5.) Felts responded to this Written Complaint on November 17, 2021, stating that the shoes would not be returned. (Sutfin Affidavit at 5.) According to Sutfin, Shelton did not submit a Regular Grievance regarding this complaint, which also was a grievable issue. (Sutfin Affidavit at 5.) Therefore, Sutfin states, Shelton did not fully exhaust his administrative remedies regarding this allegation.

(Sutfin Affidavit at 5-6.)

Shelton, in his Complaint, states that he submitted an Informal Complaint on October 12, 2021, addressed to defendant Major H. Sharpe, Felts's supervisor, explaining that he had nothing to wear on his feet for support.  (Complaint at 21.) Shelton also has provided evidence that he filed several Emergency Grievances with Hall, complaining that he was forced to walk around with only socks on his feet, subjecting him to possible irreparable damages and personal injury. (Complaint at 22.) Shelton also has provided evidence that he submitted Regular Grievances on October 26 and November 3, 2021, to the attention of Warden Anderson trying to retrieve his sneakers. (Complaint at 22.) Shelton states that Snow refused to process these grievances "under false pretenses to protect Anderson and Felts from liabilities." (Complaint at 22.)

In Shelton Affidavit 9, Shelton also states that he exhausted his administrative remedies regarding this claim by filing a Written Complaint and Regular Grievance, which he pursued to Level II, about his shoes being confiscated. (Shelton Affidavit 9 at 2.) He states that he cannot provide these forms because they were destroyed by VDOC employees. (Shelton Affidavit 9 at 3.) Shelton states that the VDOC paid him $374.00 for the property that was destroyed. (Shelton Affidavit 9 at 3.) He attached a Trust Account Summary showing a $374.99 deposit into his Trust Account on November 9, 2023, as a "property settlement." (Docket Item No. 155-18 at 5.)

Shelton attached a copy of a Regular Grievance dated October 26, 2021, on which he complained that his medically necessary sneakers were confiscated upon

his arrival at River North to Shelton Affidavit 14. (Docket Item No. 155-28 at 17-18.)  This Regular Grievance was rejected at intake by Snow on October 28, 2021, because Shelton did not attach a property confiscation form. (Docket Item No. 155-28 at 18.)   The form also notes that an intake decision was sent back to Shelton on November 3, 2021. (Docket Item No. 155-28 at 18.)   The intake decision was upheld on appeal on November 10, 2021. (Docket Item No. 155-28 at 18.) Shelton also attached a copy of a Regular Grievance, dated November 3, 2021, on which he complained that Felts had confiscated his sneakers and infringed on his agreement with Wardens Coleman and Kanode to allow him to wear the sneakers. (Docket Item No. 155-28 at 21.)  This Regular Grievance was rejected at intake on November 5, 2021, because Shelton did not attach a property confiscation form. (Docket Item No. 155-28 at 22.) This rejection informed Shelton that he must provide the confiscation form within five days for his Grievance to be processed. (Docket Item No. 155-28 at 22.)   Shelton apparently resubmitted the Grievance, and, again, it was rejected at intake on November 10, 2021, for an expired filing period. (Docket Item No. 155-28 at 22.)   The intake decision was upheld on appeal on November 19, 2012. (Docket Item No. 155-28 at 22.)

While on summary judgment the court must view the facts presented in the light most favorable to the nonmoving party, the court is not bound to treat the nonmoving party's legal conclusions as true. *See Hall v. Hopkins*, 2011 WL 6046610, at *3 (W.D. Va. Dec. 5, 2011) (citing *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217-18 (4th Cir. 1993)). While Shelton has stated by affidavit that he did fully exhaust his administrative remedies with regard to this claim, he has provided no evidence to support this legal conclusion. None of the

various administrative remedies forms Shelton filed, other than Emergency Grievances, make any mention of a complaint of walking around the prison with only socks on his feet. As stated above, according to OP 866.1, the filing of an Emergency Grievance does not exhaust administrative remedies. Furthermore, proper exhaustion requires that a Grievance contain sufficient detail as to alert prison officials of the particular constitutional claim being alleged. *See Hall*, 2011 WL 6046610, at *3. To the contrary, the defendants have provided evidence that Shelton did not fully exhaust this claim. Based on that undisputed evidence I will enter summary judgment in the defendants' favor on this claim.

Defendants Kanode, Coleman, Northrup, Ridge, Crosby, Morton, Joyce McBride, Felts, Richardson, Sharpe and Anderson argue that they are entitled to summary judgment on Shelton's claim that they violated Shelton's Eighth Amendment right to be free from cruel and unusual punishment by denying Shelton access to the prison dining hall because there was no medical order for Shelton to wear orthopedic or special shoes while at Green Rock or River North. In the alternative, these defendants argue that they are entitled to qualified immunity on this claim.

The Eighth Amendment prohibition against the infliction of "cruel and unusual punishment," not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Eighth Amendment conditions of confinement claims have both an objective and a subjective component. *See Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019). To establish a violation of the Eighth Amendment, inmates must show both (1) a serious deprivation of a basic

human need; and (2) deliberate indifference to prison conditions on the part of prison officials. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the inmate must demonstrate that the deprivation was "sufficiently serious." *Porter*, 923 F.3d at 355. "To be sufficiently serious, the deprivation must be extreme – meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of harm resulting from … exposure to the challenged conditions." *Porter*, 923 F.3d at 355. To satisfy the subjective component, the inmate must demonstrate that the prison officials acted with "deliberate indifference." *Porter*, 923 F.3d at 361. A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to [an inmate's] health or safety." *Farmer*, 511 U.S. at 837. To amount to deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer*, 511 U.S. at 837.

In Shelton's Complaint, he states that the Green Rock defendants denied him 62 meals, and the River North defendants denied him 16 meals because they would not allow him to enter the prisons' dining halls while not wearing state-issued shoes. These defendants argue that they are entitled to summary judgment because there was not a medical order for Shelton to be provided special shoes, and, therefore, Shelton, himself, made the decision not to receive meals because he would not wear the proper shoes to enter the dining hall. The evidence before the court, however, shows that Shelton did have a medical order for special shoes. This order was issued while Shelton was incarcerated at Lunenburg on orthopedic consultation by Dr. Henceroth on June 18, 2019, when he ordered orthopedic boots

to be fitted on the defendant by Powell. (Docket Item No. 155-4 at 6-7.) Furthermore, Shelton has provided evidence that these boots were approved and ordered for him, (Docket Item No. 155-6), but he never received them due to his transfer to Green Rock before his appointment to be fitted for these boots.

These defendants also argue that the deprivation alleged by Shelton was not sufficiently serious to meet the objective component of an Eighth Amendment cruel and unusual punishment claim. The Fourth Circuit has held that the objective component of an Eighth Amendment claim requires an inmate to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). The withholding of food from a prison inmate does not, per se, constitute an objectively serious deprivation in violation of the Eighth Amendment. *See Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999). "An allegation that a prison has failed to provide adequate food fit for human consumption can be sufficient to state a cognizable constitutional claim, *see Bolding v. Holshouser*, 575 F.2d 461 (4th Cir. 1978), so long as the deficiency is serious and the defendant is deliberately indifferent to the need. *Wilson* [*v. Seiter*, 501 U.S. 294, 298]." *Vitalis v. Sterling*, 2015 WL 3767292, at *3 (D. S.C. June 17, 2015). The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the "'minimal civilized measure of life's necessities.'" *Wilson*, 501 U.S. at 298 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) "Whether the deprivation of food falls below this [threshold] depends on the amount and duration of the deprivation." *Talib v. Gilley*, 138 F.3d 211, 214, n.3 (5th Cir. 1998) (missing 50 meals in five months resulting in 15-pound weight loss not sufficiently serious to state a constitutional claim); *see also Sweet v. S.C. Dep't of Corrs.,* 529 F.2d 856, 862

(4th Cir. 1975) (failure to allege adverse effects on inmate's health from food deprivation warranted dismissal of claim); *Gardner v. Beale*, 780 F. Supp. 1073, 1075-76 (E.D. Va. 1991) (two meals a day three days a week and a total of 48 days, with 18 hours between meals, not sufficiently serious deprivation to meet objective component of Eighth Amendment violation). Limited hunger and digestive problems are not sufficient to state an Eighth Amendment violation so long as the defendant is not deliberately indifferent to medical needs that arise. *See Peoples v. Padula*, 2009 WL 367399, at *4 (D. S.C. Feb. 13, 2009).

Shelton states that he was deprived of 62 meals from June 22, 2021, to July 22, 2021, at Green Rock. He claims that the loss of these meals resulted in dizziness, stomach cramps and unspecified weight loss. Once he was transferred to River North, Shelton states he was denied 16 meals between December 7 and 12, 2021, causing unspecified weight loss, dizziness, nausea, stomach cramps and pain. The defendants have provided copies of Shelton's prison medical records for these periods, showing that Shelton did not seek any medical treatment claiming any weight loss, dizziness, nausea or stomach cramps. Shelton has not produced any evidence to the contrary. These medical records also show that, upon his transfer to River North on October 8, 2021, Shelton weighed 223 pounds, up from his last weight recorded about a year earlier at Green Rock of 209.6 pounds. Furthermore, the defendants have produced evidence that Shelton ordered and received numerous food items from the Green Rock prison commissary in July 2021. (Docket Item No. 144-3 at 15-18.)  Shelton did ask to see Mental Health on June 28, 2021.  As a result of this encounter, the Psychology Associate noted: "Inmate did not present with any clinically significant symptoms. …"  (Docket Item No. 155-10 at 2.)

While Shelton's statements might be sufficient to state a claim at the pleading stage, he simply has not produced evidence sufficient to demonstrate a viable Eighth Amendment claim, in that he has not produced evidence that he suffered any significant or serious physical or mental injury. Based on the evidence before the court, I find that Shelton has failed to provide evidence that he suffered a sufficiently serious deprivation to support a finding of an Eighth Amendment violation while incarcerated at either Green Rock or River North due to being denied access to the dining halls. That being the case, I will enter judgment in the defendants' favor of these claims.

Based on the above-stated reasons, an appropriate Order and Judgment will be entered granting summary judgment to the defendants on Shelton's remaining claims.

**ENTERED**:        September 30, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

–50–